Filed 7/21/26  Brooks v. Mailloux CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| LEE BROOKS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>PRICE W. MAILLOUX, as Beneficiary, et al.,<br><br>Defendants and Appellants. | F087763<br><br>(Super. Ct. No. PR11636)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Tuolumne County.  Laura Leslie Krieg, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Plaintiff and Appellant.

Fores Macko Johnston & Chartrand and Anthony D. Johnston for Defendant and Appellant, Price W. Mailloux.

Dambacher, Trujillo & Associates and Gary P. Dambacher for Defendant and Appellant, Deniece B. Mailloux.

-ooOoo-

## INTRODUCTION

This matter arises from an appeal and cross-appeal following summary adjudication in a probate proceeding in which the court determined that an amendment to a trust was valid but found a land use restriction within that amendment invalid and unenforceable. The trust's principal asset is an 8,000-acre property in Tuolumne County, referred to by the parties as "the Ranch."

Deniece Mailloux, Price Mailloux, and Lee Brooks are the children of Patricia Brooks. Prior to Patricia's death, each sibling held a one-quarter interest in the Ranch as tenants in common, while Patricia held her one-quarter interest in a trust. During her lifetime, Patricia executed a restated trust and later, a trust amendment (the Trust Amendment)[1] accompanied by handwritten instructions (the Handwritten Instructions). Under these documents, Patricia's one-quarter interest in the Ranch was to be distributed equally among her three children upon her death. The Trust Amendment and Handwritten Instructions imposed directives requiring each sibling to use their designated parcels to "continue to operate the family ranches … as it is used." These use directives remain in effect for the lifetime of each sibling and are enforceable by forfeiture.

After Patricia's death, Price allegedly pastured his cattle in one of the fields designated to Lee. Lee filed a petition seeking enforcement of the use directives. Deniece and Price argued that the Trust Amendment was invalid for lack of delivery to Deniece, a cotrustee, during Patricia's lifetime. On summary adjudication, the lower court found that the Trust Amendment was valid, but that the land use directives were invalid and unenforceable.

Lee, plaintiff and appellant, challenges the court's finding that the land use restriction was invalid. Deniece and Price, defendants and cross-appellants, challenge the

---

[1]     Throughout the record, the Trust Amendment is often referred to as the "First Amendment." We refer to the amendment as the Trust Amendment throughout this opinion.

2.

court's finding that the Trust Amendment was valid, despite a lack of delivery. We affirm the probate court's order.

## FACTUAL AND PROCEDURAL HISTORY

### The Family Ranch

This case involves one of the founding families of Sonora, California, and a plot of land that has been in the Price family for over 100 years. The family has been in the cattle ranching business for three generations.

Louis and Melba Price held their interests in the Ranch in inter vivos trusts: The Louis B. Price and Melba B. Price Trust dated February 24, 1972, and the Louis B. Price and Melba B. Price Community Property Trust dated March 13, 1973 (the "Price Trusts").

Patricia was the daughter of Louis and Melba. Upon the death of Louis and Melba, Patricia and each of her children, Lee, Deniece, and Price, each received one-quarter interests in the Ranch as tenants in common. Patricia held her one-quarter interest in the Ranch in an inter vivos trust, The Patricia B. Brooks 1980 Separate Property Trust (Patricia's Trust), of which she was the settlor and trustee.

### The Amendment to Patricia's Trust

On September 4, 2008, Patricia's Trust was restated. Deniece was named cotrustee.

On August 19, 2015, Patricia executed the Trust Amendment. She buttressed the Trust Amendment with the Handwritten Instructions, purporting to impose directives concerning how the land should be used.

### Administration of the Trust and the Trust Amendment

Patricia died in December 2016. Deniece, the cotrustee of Patricia's Trust, was required to distribute the assets of the Trust estate in accordance with the terms of Patricia's Trust.

3.

On January 6, 2017, Deniece served the notification by trustee (Prob. Code,[2] § 16061.7). The notice included a copy of the Restated Trust, the Trust Amendment, and Patricia's will.

On January 8, 2018, the final trust distribution quitclaim deed was recorded (Quitclaim Deed). The Quitclaim Deed, signed by Deniece, provides that the Ranch shall continue to be used in the manner Patricia approved and arranged while she was alive and "if any Quitclaimee herein contests the distribution set forth below, said Quitclaimee shall forfeit his or her interest in the property."

The Quitclaim Deed further specifies:

> "Specifically, the Ford Field, Mann Field, Hospital Field, Barn Field and Ceasar Field are to continue to be used by LEE R. BROOKS and DENIECE B. MAILLOUX until their respective deaths; and the Calf Pasture, Rushing Mt., the Pipeline Field, Bull Field and the property in the mountains are to continue to be used by PRICE W. MAILLOUX until his death."

Exhibit A attached to the Quitclaim Deed explicitly references the terms of the Trust Amendment, including the forfeiture provision.

On May 28, 2019, Deniece provided a first and final account and report of trustee. An amended account, dated September 18, 2020, included copies of the Trust Amendment and the Handwritten Instructions as exhibits to the accounting.

### The Forfeiture Petition

On June 2, 2020, Lee filed a petition to confirm exercise of power of termination, determine real property is trust asset, compel reconveyance of real property for breach of condition subsequent and to quiet title, instruct trustee to convey real property, and for temporary restraining order, declaratory relief, preliminary injunction, and permanent injunction (forfeiture petition). Lee alleged that since Patricia's death, Price has repeatedly placed his livestock and molasses buckets on fields designed to Lee.

---

[2] All further undefined statutory citations are to the Probate Code unless otherwise indicated.

4.

On March 22, 2021, Lee, Price and Deniece submitted a joint stipulation of issues to be adjudicated pursuant to Code of Civil Procedure section 437c, subdivision (t).[3]  The parties submitted the following issue for adjudication:

> "Are the provisions set forth at Article V, Sections 5.1A, B., C., and D of the First Amendment Dated August 19, 2015 to The Patricia B. Brooks 1980 Separate Property Trust (hereafter, 'the Patty Trust') … valid and legally enforceable against a contingent beneficiary of the Patty Trust who is already a co-owner of a separate, co-tenant fee simple interest in the subject land, and whose separate, prior co-tenant, fee simple ownership interest was obtained independently of any distribution from the [Patty] Trust."

On June 9, 2021, the court granted the parties' joint request for summary adjudication pursuant to the Code of Civil Procedure section 437c, subdivision (t)(1)(A)(i).

On July 21, 2021, Price and Deniece filed a cross-complaint for damages.

On October 21, 2021, Price and Deniece filed their memorandum of points and authorities in support of the motion for summary adjudication.  In addition to arguing that the land use directives are unenforceable, Price and Deniece asserted that the Trust Amendment was invalid as it was not properly delivered during Patricia's lifetime.

## DISCUSSION

### I.     Lee's Appeal is Timely

In their combined respondents' and appellants' opening brief, Price and Deniece renew their contention that Lee's appeal is untimely.  They argue that the court's May 23,

---

[3]     Code of Civil Procedure section 437c, subdivision (t) provides in part:  "[A] party may move for summary adjudication of a legal issue or a claim for damages other than punitive damages that does not completely dispose of a cause of action, affirmative defense, or issue of duty pursuant to this subdivision.  [¶]  (1)(A) Before filing a motion pursuant to this subdivision, the parties whose claims or defenses are put at issue by the motion shall submit to the court both of the following:  [¶]  (i) A joint stipulation stating the issue or issues to be adjudicated.  [¶] … [¶] (2) Within 15 days of receipt of the stipulation and declarations, unless the court has good cause for extending the time, the court shall notify the stipulating parties if the motion may be filed."

2022 order granting their motion for adjudication of legal issues was an appealable order (see § 1300, subd. (a); Code Civ. Proc., § 904.1, subd. (a)(10)), and that the 60-day appeal period under California Rules of Court, rule 8.104(a)(1)(B) began to run when notice of entry was served on June 13, 2022.

This court has now considered this issue three times. Finding no compelling reason to depart from our prior determination that the May 23, 2022 order was not appealable, we reject Price and Deniece's argument and find Lee's appeal timely.

### A. Background

On December 30, 2021, the probate court issued a tentative decision granting Price and Deniece's motion for adjudication of legal issues on Lee's forfeiture petition.

On May 23, 2022, after repeated unsuccessful attempts by both sides to submit a proposed final order or judgment, the Honorable Kate P. Segerstrom issued an order disposing of the forfeiture petition (the May 23rd Order).

On June 13, 2022, notice of entry of the court's May 23rd Order was filed and served by Lee's attorney.

On August 26, 2022, counsel for Lee e-mailed opposing counsel conceding that nothing remained of case No. PR11636 after the order.

On September 8, 2022, Lee filed a notice of appeal. (See case No. F084967.)

On November 22, 2022, this court filed an order dismissing Lee's appeal without prejudice as premature. (See case No. F084967.)

On November 15, 2023, the Honorable Laura L. Krieg issued a tentative decision observing that Lee had conceded the May 23rd Order was dispositive of the entire action.

On January 9, 2024, Judge Krieg entered an order amending the May 23rd Order nunc pro tunc to confirm that no further document was needed to finalize it (the January 9th Order).

On January 16, 2024, counsel for Price served notice of entry of judgment on the January 9th Order.

On March 5, 2024, Lee filed a notice of appeal.

On April 2, 2024, Price and Deniece filed a notice of cross-appeal limited to the delivery ruling (Cal. Rules of Court, rule 8.108(g)).

On September 13, 2024, Price and Deniece moved to dismiss Lee's appeal as untimely under California Rules of Court, rule 8.104(a)(1)(B). This court granted their request for judicial notice, but denied the motion, citing *Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643.

### B. Analysis

A ruling adjudicating legal issues under Code of Civil Procedure section 437c is reviewable on appeal from a subsequently entered final judgment. (See *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 503.) Here, notice of entry of the January 9th Order was served on January 16, 2024, and Lee appealed less than 60 days later. His appeal is therefore timely.

Price and Deniece contend that the January 9th Order cannot serve as the operative judgment because it was entered nunc pro tunc and effected no substantive change to the May 23rd Order. Relying on *Estate of Eckstrom*, they argue that a nunc pro tunc order making no substantive change cannot restart the clock to appeal, and that the operative date to appeal commenced on June 13, 2022, when the May 23rd Order was entered. (*Estate of Eckstrom* (1960) 54 Cal.2d 540, 544.) The argument fails.

A nunc pro tunc order is, by definition, a corrective device. Its function is to make the record reflect what the court in fact did at an earlier time, not to supply a disposition the court did not previously render. (*Estate of Eckstrom*, *supra*, 54 Cal.2d at p. 544 [" 'The function of a *nunc pro tunc* order is merely to correct the record of the judgment and not to alter the judgment actually rendered—not to make an order now for then, but to enter now for then an order previously made' "]; accord, *Siegal v. Superior Court* (1968) 68 Cal.2d 97, 101.) Such an order cannot create finality that the underlying order

lacked, nor can it convert a nonappealable interlocutory ruling into an appealable judgment.

Neither the May 23rd Order nor the notice of entry of that order stated it disposed of the entire action, and the subsequent procedural history confirms the absence of such clarity. On August 26, 2022, counsel for Lee conceded by e-mail that there were no remaining issues to litigate following the court's May 23rd Order. On November 15, 2023, the court issued a tentative decision finding that Lee had conceded the May 23rd Order was dispositive. But a later recognition that an order resolved all remaining issues is not equivalent to the contemporaneous entry of an appealable final judgment. The May 23rd Order could not be "corrected" to reflect a conclusion that had not been made.

The characterization Price and Deniece urge therefore leads to one of two conclusions, neither of which supports their position.

First, assuming the January 9th Order was merely a ministerial correction that adds nothing of substance to the May 23rd Order, then no final judgment has ever been entered. The May 23rd Order resolved a joint motion brought under Code of Civil Procedure section 437c, subdivision (t), which by statute, adjudicates only a discrete legal issue and "does not completely dispose of a cause of action, affirmative defense, or issue of duty." An order resolving such a motion is not independently appealable. Rather, an appeal lies from a subsequent final judgment incorporating that ruling.

Under this reading, Lee's appeal is not untimely. It is premature. The proper disposition would be dismissal without prejudice and remand for entry of judgment, precisely as this court ordered in case No. F084967.

Second, if the January 9th Order provided the final disposition that the May 23rd Order lacked, then Lee's notice of appeal is timely. This reading comports with the procedural history of this case.

Price and Deniece drafted and submitted the January 9th Order to the court. The order's stated purpose was to confirm that no further document was required to finalize

8.

the matter. The premise of that submission was that finalization remained necessary, a premise inconsistent with the contention that the May 23rd Order was already a final, appealable judgment. Under this reading, the January 9th Order is the operative judgment, the 60-day appeal period commenced on that date, and Lee's notice of appeal filed on March 5, 2024, was timely.

Price and Deniece cannot have it both ways. Having obtained an order they represented to the court as the instrument necessary to finalize the disposition, they cannot now recharacterize that order as a nullity, thereby making the timeline to appeal back by approximately 18 months.

We acknowledge that the lower court issued an order clarifying the appealability of the May 23rd Order. However, its characterization of an order as final and appealable is not controlling. The existence of appellate jurisdiction is a question for the reviewing court, and a trial court cannot retroactively render its own prior interlocutory order final by subsequently declaring it to have been final. (*Kirk v. Ratner* (2022) 74 Cal.App.5th 1052, 1060 ["A superior court's order is generally appealable only when made so by statute"].)

Based on the foregoing, we conclude that Lee's notice of appeal, filed March 5, 2024, was timely filed.

## II.     The Trust Amendment Does Not Fail for Lack of Delivery

Deniece and Price assert the Trust Amendment is invalid for lack of delivery during Patricia's lifetime. We are not persuaded.

### A.     *Background*

#### 1.     The Trust and Evidence Related to the Trust Amendment

Patricia provided for the methods of revocation and modification of the Trust in article VII, section 7.2, which provides the following:

> "7.2 Amendment. The Settlor may at any time during the Settlor's lifetime, amend any of the terms of this instrument by a written instrument executed by the Settlor and delivered personally or by certified mail to the

9.

Trustee. No amendment shall substantially increase the duties or liabilities of the Trustee or change the Trustee's compensation without the Trustee's consent, nor shall the Trustee be obligated to act under such an amendment unless the Trustee accepts it."

Lee submitted a declaration in the court below, stating the following:

"3. Subsequent to the drafting and execution of the holographic document, the document remained on my mother's desk. When my mother was still alive, Deniece would come and visit. During one of those visits, while I was also at my mother's house, I saw Deniece review the holographic document at my mother's house.

"4. That same day, after reviewing the will, Deniece called me to ask me if I was ok with the terms of the holographic documents, specifically the provision that gifts my mother's house to Deniece.

"5. Once the holographic document was submitted to Richard Calone, the family trust attorney, I was included in emails between Deniece and Richard discussing the holographic instrument, the First Amendment and the conditions subsequent. A true and correct copy of the emails are attached hereto as Exhibit A."

On March 1, 2016, in an e-mail correspondence between Calone and Deniece, Calone referenced the distribution of the fields: "Then the ranch will be fractionalized by existing fields if your Mom signed my last amendment to her trust which I have not seen come back. You might ask LEE and his wife for a signed copy for my files as it is very important document." Deniece replied, "I will ask Lee whether the amendment to my mothers [sic] property trust/will has been returned to you. I was not a party to the finalization of that document but I trust that you and Lee executed it so that when mom passes there won't be any surprises or grumbling." She added: " 'Fractionalized' use of the ranch is the best plan for the future as long as the ranch and the mountain property remains one entity. As a fiduciary, as well as a beneficiary, I expect everyone to be treated fairly."

On March 7, 2016, Calone wrote the following response to questions Deniece had e-mailed to him:

10.

"I'm trying to imagine the ranch after mom has passed and the trust has terminated.

"The ranch will have a title change obviously.
"Will we retitle the entire ranch and mountains to our 3 separate property trusts with one third undivided interest? *Answer Yes-unless Price objects to your Mother's instruction to farm/ranch by fields instead of legal descriptions*." (Italics added.)

On March 8, 2016, Calone sent Deniece another e-mail referencing the fields:

"The termination of the trust is by deed equally to the three of you. Then the operation will be by lessee by carrying capacity to the two operations from the three owners hopefully by the fields your MOM laid out in her trust."

Finally, on March 24, 2016, someone within the same law firm as Calone, Calone and Harrel, confirmed they had received a copy of the signed Trust Amendment:

> "During our telephone conversation this morning, you asked me to check to see if Patti ever signed the Trust Amendment that we sent her last fall. I see that we did receive it back signed. Copy of First Amendment, Exhibit A to First Amendment and 2015 Will are attached above."

## B.     *The Probate Court's Ruling on Delivery*

On December 30, 2021, the court issued an order after hearing, finding the Trust Amendment valid, but the use directives invalid and unenforceable. With respect to delivery of the Trust Amendment, the court explained that section 7.2 of the Trust permitted modification by signed writing delivered to the trustee. The court held the provision permitting delivery by personal or certified mail was neither expressly nor impliedly exclusive under *Cundall v. Mitchell-Clyde* (2020) 51 Cal.App.5th 571, 586.)[4]

---

[4]     Section 15402, which governs modification of a trust, provides: "[*u*]*nless the trust instrument provides otherwise*, if a trust is revocable by the settlor, the settlor may modify the trust by the procedure for revocation." (Italics added.) Thus, when the trust instrument "specifies how the trust is to be modified," and that method is exclusive, that "method must be used to amend the trust." (*King v. Lynch* (2012) 204 Cal.App.4th 1186, 1192, 1193, overruled on other grounds by *Haggerty*, *supra*, 15 Cal.5th at p. 742.)

The court found delivery to Patricia, a cotrustee, was satisfied by execution of the Trust Amendment. (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 553 [finding that settlor and trustee "delivered" interlineations to himself when he made them], overruled on other grounds by *Haggerty v. Thorton* (2024) 15 Cal.5th 729, 742 (*Haggerty*).)

Delivery to Deniece, also a cotrustee, presented a triable issue. Nonetheless, the court held that Deniece was estopped from contesting delivery, explaining she had accepted the amendment (§ 15600, subd. (a)), disseminated the Trust pursuant to the amendment's terms, identified it in her accounting, and incorporated its language into the recorded distribution deeds rather than declining to act, contesting the amendment, or seeking court instruction under sections 15601, 16061, or 17200, subdivision (b)(3).

### C.    Standard of Review

A motion for summary judgment or summary adjudication seeks determination of an action or issue as a matter of law under Code of Civil Procedure section 437c. The purpose of summary judgment "is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

A defendant moving for summary judgment bears the initial burden of showing "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1131.) A defendant satisfies that burden by showing either that the plaintiff cannot establish one or more elements of a cause of action or that a complete defense exists. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 853; *Raghavan*, at p. 1132.)

Summary adjudication operates in the same manner as summary judgment but addresses discrete claims or issues rather than the entire action. (*Oroville Hospital v. Superior Court* (2022) 74 Cal.App.5th 382, 398; Code Civ. Proc., § 437c, subd. (f)(1).)

Although a motion for summary adjudication ordinarily resolves only specified causes of action, affirmative defenses, claims for damages, or issues of duty (Code Civ. Proc., § 437c, subd. (f)(1)), adjudication of a dispositive issue may effectively resolve the entire controversy. (See *Belio v. Panorama Optics, Inc.* (1995) 33 Cal.App.4th 1096, 1101–1102.)

A grant of summary adjudication is binding as to the issues determined and precludes relitigation of those issues. (*Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 99.)

" 'In reviewing the propriety of a summary [adjudication], the appellate court independently reviews the record that was before the trial court…. We must determine whether the facts as shown by the parties give rise to a triable issue of material fact." (*Soderberg v. McKinney* (1996) 44 Cal.App.4th 1760, 1765.) The reviewing court construes the evidence in the light most favorable to the opposing party and resolves doubts in favor of denying the motion. (*Ibid*.)

### D.  *Permissible Methods for Modifying the Trust*

The Probate Code governs revocation and modification of a trust. Section 15401, subdivision (a) provides for two alternative methods for revocation: compliance with any method provided in the trust instrument (§ 15401, subd. (a)(1)), or a writing, other than a will, signed by the settlor and delivered to the trustee during the settlor's lifetime (*id*., subd. (a)(2)). The so-called statutory method is unavailable only when "the trust instrument explicitly makes the method of revocation provided in the trust instrument the exclusive method of revocation." (*Ibid*.)

Section 15402 imports those procedures into the context of modifications, providing that "[u]nless the trust instrument provides otherwise … the settlor may modify [a trust] by the procedure for revocation." In *Haggerty*, our Supreme Court examined this provision and held that "a trust may be modified via the section 15401 procedures for revocation, including the statutory method, unless the trust instrument provides a method

13.

of modification and explicitly makes it exclusive, or otherwise expressly precludes the use of revocation procedures for modification." (*Haggerty*, *supra*, 15 Cal.5th at p. 733.) The court clarified that a trust instrument that "merely specifies a method of modification without limiting settlors to the use of that method does not preclude the use of the revocation procedures." (*Id*. at p. 736.)

Article VII, section 7.2, which addresses modifications to the Trust, does use language of exclusivity or limitation. It specifies a method of modification but contains no exclusivity language, such as "shall," "solely," "must," or "only by," and no other provision of the Trust expressly precludes modification by the statutory revocation procedures. Patricia therefore retained the ability to amend the Trust "[b]y a writing, other than a will, signed by the settlor … and delivered to the trustee during the lifetime of the settlor." (§ 15401, subd. (a)(2).)

Price and Deniece contend that *Haggerty* should not retroactively apply here, arguing that to do so would contravene public policy and fairness principles. They reason that Patricia should not have been permitted to amend her trust in secret. The record does not support their assertion that Patricia's trust was amended in secret. In any event, *Haggerty* did not announce a new rule. It resolved a split of authority, confirming that a trust may be modified through the revocation procedure unless the instrument provides an exclusive method of modification. (*Haggerty*, *supra*, 15 Cal.5th at p. 736.) We see no reason why it should not apply here.

## II.     Relevant Legal Principles Governing Delivery of a Trust Amendment

The question we must answer is whether delivery of the Trust Amendment to Deniece, the sole surviving cotrustee, occurred within Patricia's lifetime. The term "delivery" is not explicitly defined in section 15401, nor is it well-settled in case law. Secondary authority, however, provides guidance. Bogert explains: " 'Delivery' in the best modern usage means the manifestation of the settlor's intention that the instrument in question have operative effect. It does not necessarily refer to possession of the

14.

instrument or to manual transfer of the document. It is more the expression of the idea that the document is to cause a change in legal relations at once." (Bogert's The Law of Trusts and Trustees, Delivery of the trust instrument, § 147, fn. omitted.) By contrast, Black's Law Dictionary defines delivery as "[t]he formal act of voluntarily transferring something; esp., the act of bringing goods, letters, etc. to a particular person or place." (DELIVERY, Black's Law Dictionary (12th ed. 2024).)

We also find some guidance based on the purposes underlying the lifetime delivery requirement, which are threefold. First, the requirement authenticates the instrument as the settlor's act. Second, it confirms that the settlor intended the instrument to have operative effect, rather than remain a draft. Third, it protects the trustee, who might otherwise disseminate trust property "in ignorance of the existence of an attempted exercise of the power that had not been delivered to the trustee." (*Estate of Wood* (1973) 32 Cal.App.3d 862, 883.)

## III. Delivery of the Trust Amendment During Patricia's Lifetime

Lee does not dispute that the Trust Amendment required delivery of the Trust Amendment to both Patricia and Deniece, as cotrustees.[5] We agree. Given that one

---

[5]     The Trust Amendment provides:

"7.2 Amendment. The Settlor may at any time during the Settlor's lifetime, amend any of the terms of this instrument by a written instrument executed by the settlor and delivered personally or by certified mail to the Trustee. No amendment shall substantially increase the duties or liabilities of the Trustee or change the Trustee's compensation without the Trustee's consent, nor shall the Trustee be obligated to act under such an amendment unless the Trustee accepts it."

Article XI, section 11.7 of the Trust provides: "As used in this instrument, the masculine, feminine or neuter gender *and the singular or plural number*, shall each include the others whenever the context so indicates." (Italics added.)

Read together, these provisions require that the term "Trustee" in article VII, section 7.2 be construed to include multiple trustees where the context so indicates.

15.

purpose of the lifetime delivery requirement is to protect against the distribution of trust property without knowledge of a valid amendment, delivery must occur to a trustee capable of administering the Trust after the settlor's death. In this case, that necessarily required delivery of any amendments to Deniece, the sole surviving cotrustee.

Delivery was made to Patricia, the settlor and trustee, when she made the Trust Amendment and delivered it to her attorney. (See generally *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888 (*Gardenhire*) [settlor-trustee's execution of a will effectively revoking her trust was sufficient to provide herself with notice of intent to revoke]; *Haggerty v. Thornton* (2021) 68 Cal.App.5th 1003, 1006 [finding delivery occurred where settlor-trustee executed amendment of a trust and then sent it to her attorney, but otherwise failed to fully comply with the method for modification].)

With respect to Deniece, the probate court acknowledged a triable issue of material fact as to whether delivery of the Trust Amendment had occurred to her. The court bypassed the question by concluding that estoppel foreclosed Deniece's challenge to delivery. The court observed that Deniece had administered the Trust under the Amendment for years. Under the circumstances, we agree with the court's conclusion that Deniece cannot now contest delivery of the Trust Amendment.

Preliminarily, we observe that the record reflects that Deniece had contemporaneous knowledge of the Trust Amendment, and that knowledge went beyond a general awareness that an amendment existed. The e-mails Lee submitted reflect that Patricia and Calone discussed the fractionalization of the Ranch that would occur after Patricia's death, i.e., the use directives. Lee also submitted a sworn declaration that he observed Deniece review the Handwritten Instructions.

We do not suggest that these facts cure any defect in the lifetime-delivery requirement. Contemporaneous knowledge of an amendment is not tantamount to

Accordingly, although the amendment provision refers to "the Trustee" in the singular, the Trust contemplates delivery to all serving trustees.

delivery. It is, however, relevant to acceptance of the amendment's terms and forfeiture of the right to later contest whether the lifetime delivery requirement was met.

Assuming a defect existed in the lifetime delivery requirement, we are not persuaded that it supports invalidation of the Trust Amendment. As trustee, Deniece represented that Patricia had established the Trust on August 21, 1980, with Patricia as settlor, that Patricia and Deniece were cotrustees, and that the Trust had been "amended by that certain [Trust] Amendment to the Patricia B. Brooks Separate Property Trust dated August 21, 1980, restated September 4, 2008, dated August 19, 2015." Deniece attached the 1980 Trust, the Trust Amendment, and the Handwritten Instructions concerning continued use of the fields as the operative trust documents. Deniece also served notices under section 16061.7, identifying the Trust Amendment as part of the operative trust.

Price did not object to the accounting and neither Price nor Deniece challenged the validity of the Trust Amendment or Handwritten Instructions. In her verified accounting, Deniece identified the Trust Amendment as part of the operative trust, attached it along with the 1980 Trust and the Handwritten Instructions as the governing trust documents, and obtained judicial approval for trust administration conducted on that basis. The record also reflects that Deniece accepted a life estate in Patricia's home and guest house, conveyed only in the Handwritten Instructions and the First Amendment.

Section 15600, subdivisions (a)(2) and (b) provide that a trustee may accept a trust by "[k]nowingly exercising powers or performing duties under the trust instrument or the trust instrument as modified." The same principle governs acceptance of a modification: a trustee who knowingly exercises powers or performs duties under the trust instrument as modified accepts the modification. Section 15600, subdivision (b) qualifies this rule only narrowly, permitting a person named as trustee to act in an emergency to preserve trust property without accepting the trust, provided the person delivers a written objection within a reasonable time. A trustee who does not wish to accept a trust or an amendment

to a trust has statutory mechanisms available.  They may reject the trust or, by parity, the amendment (§ 15601), or petition for instructions regarding the instrument's validity (§ 17200, subd. (b)(3)).  A trustee who instead administers the trust under the amendment's terms accepts those terms by operation of section 15600, subdivision (a)(2).

Rather than taking any of the statutory paths available to a trustee who disputes an amendment, Deniece administered the Trust under the terms of the Trust Amendment and Handwritten Instructions.  She disseminated the Amendment as part of the trust's operative terms in discharging her duty under section 16061.7.  She identified the Trust Amendment as part of her trusteeship in her account and report of trustee, and she carried the Amendment's language into the Quitclaim Deed to effectuate distributions.  Each of those acts is an exercise of trustee power or performance of a trustee duty under the Trust Amendment.  Together, they constitute acceptance under section 15600, subdivision (a) as a matter of law.

The delivery requirement is a procedural protection for trustees, designed, in part, to ensure they are not bound by a modification of which they lacked notice.  (*Estate of Wood*, *supra*, 32 Cal.App.3d at p. 883.)  But a trustee who knowingly administers a trust under an amendment has neither lacked notice nor suffered prejudice from any technical defect in delivery.  Allowing a trustee to administer a trust under an amendment, invoke its authority to accept benefits conveyed under the amendment, and later, repudiate the instrument when its terms become unfavorable would turn a procedural safeguard into a strategic weapon.  In our view, construing the lifetime delivery requirement to permit such gamesmanship would expand a procedural safeguard beyond its intended function.

Based on the foregoing, we conclude that Deniece's acceptance of the Trust Amendment forecloses her challenge to the lifetime delivery requirement.

IV.     **Enforceability of the Use Directives**

Lee contends the lower court erred in finding that the use directives are invalid and unenforceable.  We are not persuaded.

## A.    *Background*

As relevant here, article V, section 5.1 of the Trust Amendment, executed August 19, 2015, provides the following:

"5.2 <u>Specific Directions and Instructions</u>.  Notwithstanding the legal vesting of the various properties at my death, it is my direction and instruction that my children continue to operate the family ranches as follows:

"A.    It is my direction that the ranch which has been in my family for over one hundred (100) years be used, notwithstanding the unequal division into thirds, continue to be used as it is used and divided at the present time by my three (3) children, which I have approved and arranged during my lifetime.  Specifically, the Ford Field, Mann Field, Hospital Field, Barn Field and Ceasar and Steer Field are presently being used by my son LEE R. BROOKS and my daughter DENIECE B. MAILLOUX.  It is my direction that DENIECE B. MAILLOUX and LEE R. BROOKS continue using these fields as currently used until their respective deaths.

"B.    The Calf Pasture, Rushing Mt., the Pipeline Field, Bull Field and the property in the mountains is currently being used by my son PRICE W. MAILLOUX.  It is my direction that PRICE W. MAILLOUX continue using these properties as currently used until his death.

"C.    My Sons, PRICE W. MAILLOUX and LEE R. BROOKS each already have homes on the ranch without separate deed.  It is my direction that my daughter DENIECE B. MAILLOUX receive the use of my house and guest house at my death until she is no longer able.

"Attached hereto as Exhibit 'A' is a true and correct copy of my handwritten instructions confirming the directions set forth in Paragraphs A through C above of this Section 5.1.  If any provision contained herein conflicts with my intentions as set forth in my handwritten instructions and directions, my handwritten instructions attached hereto as Exhibit 'A' shall control.

"D.    If any of my children refuse or fail to comply with my directions and instructions at my death or subsequent thereto, the gift of my twenty-five percent (25%) interest in said Property in equal shares to each of them shall become void as to the child failing to comply and that child

19.

shall forfeit all right to receive his or her share of my interest in the Property."

Exhibit A to the Trust Amendment contains the Handwritten Instructions. The Handwritten Instructions, dated February 12, 2014, provide the following:

> "I want the ranch, that has been in my family for over a hundred years, to be used and divided as it is used and divided at the present time prior to my death. Specifically, the Ford field, Mann field, Hospital field, Steer field, Barn field and Ceasar field is presently being used by my son Lee and my daughter Deniece. My wish is for Deniece and Lee to continue using those fields for their lifetime. The Calf pasture, Rushing Mt., the Pipeline field, bull field and the property in the mountains is being used by my son Price and my wish is for Price to continue using those pieces of property for his lifetime. My sons Lee and Price already have homes on the ranch, I want my daughter, Deniece, to have my house and guesthouse.

> "As to all provisions, they will remain the same.

> "If any of my three children contest my will and wishes that child will result with an inheritance of $1 total."

## B.     *The Probate Court's Ruling*

Having found the Trust Amendment valid, the probate court next addressed whether the use directives were valid and enforceable. The court concluded that Patricia's trust did not create any enforceable restriction limiting the siblings' preexisting rights as tenants in common to enter, occupy, and use the Ranch as a whole. The court reasoned that, had the Trust imposed such a restriction by penalty of forfeiture, it would constitute an unreasonable restraint on alienation. The court further found the directive that the siblings "continue to operate the family ranches" impermissibly vague and ambiguous.

The court explained that Patricia's directives attempted to create two conditions. First, that each child "continue using" their designated fields; and second, that each child "continue to operate the family ranches … as it is used." Because Patricia made these directives subject to forfeiture, the court observed that settled principles disfavoring conditions subsequent and forfeiture governed its interpretation.

20.

Turning to the language of the Trust and the Trust Amendment, the court identified tension between sections 5.1 and 5.2 of article V. Section 5.1 directs use of designated fields upon penalty of forfeiture, while section 5.2 provided for distribution of Patricia's interest "free of trust." The court further concluded that the Handwritten Instructions, which the Trust Amendment made controlling in the event of any conflict, employed precatory rather than mandatory language, expressing Patricia's wishes rather than creating conditions enforceable through forfeiture.

The court therefore concluded that the siblings were not required to continue using their designated fields to preserve their interests. Otherwise, the condition would constitute an unenforceable restraint on alienation.

The court further held that use of another sibling's designated area could not trigger forfeiture in light of the siblings' preexisting tenancy in common interests in the Ranch. Each sibling holds an equal tenancy-in-common interest with the right to enter, occupy, and use the whole of the Ranch, and no individual sibling possesses the right to oust or exclude another. Thus, the court reasoned, if Price used the Ford field, an area Patricia designated to Lee and Deniece, such use would not constitute wrongdoing absent waste or impermissible interference with cotenant rights.

The court distinguished authority involving enforceable forfeiture conditions. In *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, for example, the grantors owned the subject property in fee simple, expressly conditioned the conveyance upon performance, and included clear language specifying consequences for breach. By contrast, the court concluded Patricia expressed only a "wish" that her children would use the designated fields and included no express forfeiture mechanism tied to one sibling's use of another sibling's designated field.

With respect to the directive that the siblings "continue to operate" the Ranch, the court found that condition was impermissibly vague. According to the court, the requirement that the siblings not "fail to continue to operate the family ranches as they

are used" was "too amorphous and impossible to define with sufficient precision to permit notice or judicial enforcement." The Amendment did not explain what it meant to "operate" the Ranch "as it has been used," leaving the siblings without any objective means of understanding what was required.

Finally, the court observed that alternative remedies remained available. Specifically, it noted that Lee has a separate action pending against Price (case No. CV63882), asserting claims for waste, nuisance, or conversion.

### C.      *Standard of Review*

" 'In construing trust instruments, as in the construction and interpretation of all documents, the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker.' " (*Gardenhire*, *supra*, 127 Cal.App.4th at p. 888; see § 21102, subd. (a) ["The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument"].) The settlor's intent " ' "must be ascertained from the whole of the trust instrument, not just separate parts of it." ' " (*Estate of Cairns* (2010) 188 Cal.App.4th 937, 944, quoting *McIndoe v. Olivos* (2005) 132 Cal.App.4th 483, 487; accord, *Ammerman v. Callender* (2016) 245 Cal.App.4th 1058, 1074.)

We review a claim involving interpretation of a trust or a trust amendment de novo. (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1130; *Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 213–214; *Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439.) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it." (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.)

### D.      *Analysis*

To determine whether the use directives are enforceable, we first address the vehicle by which Patricia sought to convey her gift. The use directives, which appear in

the Trust Amendment and Handwritten Instructions, are susceptible to two competing interpretations.

Under one view, they operate as conditions subsequent subject to forfeiture. Pursuant to this characterization, section 5.2 conveys a fee subject to defeasance on breach of the use directives in section 5.1, with section 5.1(D)'s forfeiture provision operating as the penalty. Under another view, the directives express a precatory wish, which impose no binding obligation. We conclude that Patricia intended to establish conditions subsequent, enforceable by forfeiture, which continue for the lifetime of each sibling.

Our reasoning is set forth in subheadings C.1. through C.3. of this part, *post*, which address the legal character of the use directives. We then consider, in subheading C.4., *post*, whether the directives constitute an unreasonable restraint on alienation, and in subheading C.5., *post*, whether their terms are sufficiently definite to permit enforcement.

### 1. Whether Patricia's Use Directives Create Binding Obligations or Express Precatory Wishes

"The expression of a desire, wish, recommendation, assurance, request, etc., is *prima facie* precatory in character." Whereas, "a 'direction' *prima facie* imports a command." No hard-and-fast rule governs all cases. (*Estate of Farelly* (1931) 214 Cal. 199, 204–205.)

Applying that framework, article V, section 5.1's language is mandatory on its face. The provision is titled, "Specific Directions and Instructions." The preface states that "it is my direction and instruction that my children continue to operate the family ranches." Each operative subsection states, "It is my direction." Section 5.1(D) provides that any noncomplying child's share "shall become void" and that child "shall forfeit" all right to his or her share. Repeated use of the terms, "direction" and "instruction," coupled with the forfeiture remedy, is the formulation of a condition subsequent rather than a precatory wish.

23.

In contrast, the Handwritten Instructions contain precatory language. We have italicized the relevant operating terms below:

> "*I want* the ranch, that has been in my family for over a hundred years, to be used and divided as it is used and divided at the present time prior to my death. Specifically, the Ford field, Mann field, Hospital field, Steer field, Barn field and Ceasar field is presently being used by my son Lee and my daughter Deniece. *My wish* is for Deniece and Lee to continue using those fields for their lifetime. The Calf pasture, Rushing Mt., the Pipeline field, bull field and the property in the mountains is being used by my son Price and *my wish* is for Price to continue using those pieces of property for his lifetime. My sons Lee and Price already have homes on the ranch, *I want* my daughter, Deniece, to have my house and guesthouse.

> "As to all provisions, they will remain the same.

> "If any of my three children contest my will and *wishes* that child will result with an inheritance of $1 total." (Italics added.)

The Handwritten Instruction uses "I want" twice as the operative governing phrase. First, regarding the Ranch generally: "*I want* the ranch … to be used and divided as it is used and divided at the present time prior to my death." Second, in connection with the provision addressing Patricia's house, which was conveyed to Deniece: "*I want* my daughter, Deniece, to have my house and guesthouse."

The word "wish" also appears three times. First, in connection with the fields designated to each sibling. Second, in the plural form, "wishes," is used in connection with the no contest clause: "If any of my three children contest my will and *wishes* that child will result with an inheritance of $1 total." (Italics added.)

Standing alone, the phrases, "I want" and "my wish" ordinarily convey a preference rather than a directive and are therefore commonly understood as precatory. But Patricia did not leave those expressions without consequence. She expressly provided that any child who "contest[s] my will and wishes" would receive only $1. By attaching a forfeiture provision to her "wishes," Patricia manifested an intent that they be enforced and not treated as mere expressions of preference or hope. Thus, although the

24.

Handwritten Instructions employ language that is facially precatory, the no contest clause demonstrates that Patricia intended those provisions to carry binding legal effect.

### 2. The Trust Amendment and Handwritten Instructions Do Not Materially Conflict

The probate court invoked the "inconsistency-resolution clause" (art. V, § 5.1) to conclude that the Handwritten Instructions' "precatory" language displaced the Trust Amendment's directive language.[6] But that conclusion rests on a faulty premise: that these instruments are incompatible. Absent a material inconsistency, the court had no occasion to invoke the inconsistency-resolution clause or to subordinate the Trust Amendment to the Handwritten Instructions.

In our view, these documents unequivocally demonstrate that Patricia intended to implement the use directives as mandatory instructions upon penalty of forfeiture.

We acknowledge that the two instruments are not identical. However, none of these distinctions concern the mandatory versus precatory character of the use directives, which is the only inconsistency upon which the court relied to import precatory meaning into the directives.

First, the two instruments describe Deniece's interest in the residence differently. Section 5.1(C) grants Deniece "the use of my house and guest house at my death until she is no longer able," while the Handwritten Instruction provides, "I want my daughter, Deniece, to have my home and guesthouse." But the residence provision is not part of the use directives governing the Ranch fields, and its construction does not bear upon whether the use directives are mandatory or precatory.

---

**6** Under Section 5.1, the Trust Amendment provides:

"Attached hereto as Exhibit 'A' is a true and correct copy of my handwritten instructions confirming the directions set forth in Paragraphs A through C above of this Section 5.1. If any provision contained herein conflicts with my intentions as set forth in my handwritten instructions and directions, my handwritten instructions attached hereto as Exhibit 'A' shall control."

25.

Second, the two instruments contain distinct penalty provisions. Section 5.1(D) voids a noncomplying sibling's interest for failure to comply with the use directives. The Handwritten Instructions reduces a contesting sibling's inheritance to $1 if that sibling contests Patricia's "will and wishes." A compliance-based forfeiture and a no contest clause are different instruments that serve different ends, and they operate in tandem rather than in conflict.

Dispensing with the Trust Amendment in favor of the Handwritten Instructions when there is no significant conflict between their terms is problematic for another reason. Section 21120 provides that every provision of a trust be given effect if reasonably possible. A reading that disregards the Trust Amendment in favor of the Handwritten Instructions nullifies "direction and instruction" in section 5.1's preface, its repeated invocation of "It is my direction" in section 5.1(A) through (C), and the "shall become void" and "shall forfeit" language in section 5.1(D). An interpretation that disregards that much of the operative language in favor of the expressions "I want" and "my wish," despite the fact that these expressions were reinforced by a no contest clause, is inconsistent with section 21120.

We conclude that the Trust Amendment and Handwritten Instructions do not conflict as to their relevant operative terms. Taken together, they establish that Patricia intended the use directives to be legal rather than moral obligations. Having established that the directives set forth in the Trust Amendment and buttressed by the Handwritten Instructions were mandatory, the next question is their legal character.

### 3. The Trust Amendment Created a Condition Subsequent Subject to Enforcement by Forfeiture

Three components of the Trust Amendment operate together to create a single integrated condition subsequent, subject to enforcement by a forfeiture penalty.

First, section 5.2 creates the property interest conveyed. That provision directs distribution of Patricia's 25 percent interest in the Ranch to her three children in equal

shares, "free of trust."  Under Civil Code section 686, equal ownership interests without language creating a joint tenancy or partnership establish a tenancy in common. Following Patricia's death, each sibling acquired an undivided 8.33 percent interest from Patricia, which combined with each sibling's preexisting 25 percent interest inherited from Louis and Melba, producing a present 33.33 percent cotenancy interest in the Ranch as a whole.

Second, section 5.1 imposes use directives governing Patricia's gift.  This provision begins with the following preface:  "*Notwithstanding* the legal vesting of the various properties at my death, it is my direction and instruction that my children continue to operate the family ranches as follows."  (Italics added.)  The word "Notwithstanding" is significant as it carries a settled legal meaning.  The provision it introduces controls despite any competing provision to which it refers.  (See generally *California Taxpayers Action Network v. Taber Construction, Inc.* (2017) 12 Cal.App.5th 115, 130 [" '[t]he ordinary meaning of the word "notwithstanding" is "in spite of" ' "].)  Patricia's instruction that the siblings continue to operate the Ranch "[n]otwithstanding the legal vesting" signals that section 5.1 was intended to operate despite section 5.2's otherwise unrestricted "free of trust" distribution.

The use directives that follow are correspondingly specific.  Patricia assigned Price the use of the Calf pasture, Rushing Mt., Pipeline field, Bull field, and mountain property, while Lee and Deniece were to use the Ford, Mann, Hospital, Barn, Ceasar, and Steer fields.  The Amendment further directs that the Ranch be used "as currently used," and "as it is used and divided at the present time."  A settlor intending merely to express a nonbinding wish does not ordinarily write, "Notwithstanding the legal vesting."  That language only makes sense if Patricia intended the use directives to qualify the otherwise unrestricted vesting that section 5.2 would have accomplished standing alone.

Third, section 5.1(D) provides an enforcement mechanism that any noncomplying sibling's share of Patricia's gift "shall become void" and that sibling "shall forfeit" all

27.

rights to that share. Read together, sections 5.1 and 5.2 establish the following structure: Patricia's interest vests immediately and "free of trust," but remains subject to divestment upon noncompliance with the use directives. These provisions evince an intent by Patricia to establish a condition subsequent subject to forfeiture.

"A condition subsequent is one referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." (Civ. Code, § 1438.) "With respect to interests in real estate in particular, '[c]onditions subsequent are those which in terms operate upon an estate conveyed and render it liable to be defeated for breach of the conditions.… While no precise form of words is necessary to create a condition subsequent, still it must be created by express terms or by clear implication.' " (*Wooster v. Department of Fish & Game* (2012) 211 Cal.App.4th 1020, 1027, quoting *Hawley v. Kafitz* (1905) 148 Cal. 393, 394.)

A condition subsequent, particularly one with a forfeiture penalty, is disfavored because they destroy vested estates. (*Hawley v. Kafitz*, *supra*, 148 Cal. at p. 394; *Cleary v. Folger* (1890) 84 Cal. 316, 321 [" 'Forfeitures … are not favored by the courts….' "], overruled on other grounds by *Newton v. Hull* (1891) 90 Cal. 487, 492; Civ. Code, § 1442 ["A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created"].) Accordingly, if the language reasonably bears another construction, courts avoid construing an instrument to impose forfeiture. (*Hawley*, at p. 394.)

Characterizing the use directives as a condition subsequent raises another question: How could such conditions operate against beneficiaries who already possessed substantial cotenancy interests in the Ranch? For the reasons discussed below, we find tension between these two interests.

### 4. The Use Directives are in Tension with the Sibling's Preexisting Cotenancy Interests

Each sibling's 33.33 percent cotenancy interest in the Ranch derives from two distinct sources: 25 percent was inherited directly from Louis and Melba through the Price Trusts, and was distributed in fee, unrestricted, while the remaining 8.33 percent was distributed through the Trust Amendment and is the only portion subject to section 5.1's use directives.[7]

At distribution, however, the siblings acquired a single undivided possessory estate in the Ranch as tenants in common. Section 5.2 distributed Patricia's interest "free of trust" in equal shares to the siblings. Under Civil Code sections 685 and 686, equal fractional ownership interests distributed without joint tenancy language create a tenancy in common, under which each cotenant possesses an undivided interest in the whole property and use.

Each sibling therefore holds, at present, a 33.33 percent tenancy-in-common interest derived from two distinct sources but exercised through undivided rights of possession in the whole property. California law is clear that tenants in common each possess the right to occupy and use the entirety of the property, not any physically segregated portion of it. (Civ. Code, §§ 685, 686; *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 548 (*Zaslow*).)

Cotenants may, however, contract among themselves to give each an exclusive right of use or occupancy in a designated portion of the property, without altering the undivided character of their interests. (See *Bakanauskas v. Urdan* (1988) 206 Cal.App.3d 621, 628–630; *Tom v. City and County of San Francisco* (2004) 120 Cal.App.4th 674, 677 [tenants in common may "make agreements among themselves, to give each owner an exclusive right of occupancy"]; accord, 86 C.J.S. Tenancy in Common, § 100 ["an agreement between tenants in common giving one the

---

[7]     Basic property law dictates that Patricia could only impose conditions on the interest she owned and conveyed.

right to exclusive use or possession of all or part of the property is enforceable"].) Such agreements operate at the level of possession rather than title because each cotenant retains an undivided fractional interest in the whole, while contractually agreeing to honor designated areas of exclusive occupancy or use.

Because such an agreement governs possessory use, rather than title, breach is redressable through ordinary remedies between cotenants, not forfeiture of title. An aggrieved cotenant may, for example, pursue remedies such as damages, injunctive relief, and an equitable accounting. (See *Zaslow*, *supra*, 29 Cal.2d at p. 548 [discussing remedies for ouster of a cotenant, including the right "to recover common possession of the premises and damages for loss of use"]; *Hunter v. Schultz* (1966) 240 Cal.App.2d 24, 30–31 [reasonable value of an occupying cotenant's use may be offset against contribution in an equitable accounting]; 16 Cal.Jur.3d Cotenancy and Joint Ownership, § 63 [discussing remedies available against violating cotenant].) But generally, forfeiture of title is not an available remedy against the breaching cotenant.

In the absence of such an agreement, however, the default rule governs, and no cotenant may exclude another from any part of the property. (*Tom v. City and County of San Francisco*, *supra*, 120 Cal.App.4th at p. 677; *Zaslow*, *supra*, 29 Cal.2d at p. 548; *Krum v. Malloy* (1943) 22 Cal.2d 132, 135.) Because all cotenants share the right to possess the whole property, no one of them owns any specific portion of it by themselves. (*Wood v. Henley* (1928) 88 Cal.App. 441, 452 ["the cotenants hold the common land by unity of possession, for which reason there can be no specific or determinate portion of the common land which any one of such tenants can claim as his in severalty"].)

Here, the siblings never executed a formal use agreement. Although the siblings accepted Patricia's gifted interest, acceptance of a testamentary transfer does not, by itself, establish assent to a broader sibling agreement governing the Ranch. Absent evidence of mutual assent, acceptance of the distribution reflects acquiescence to Patricia's transfer, not necessarily agreement to be legally bound by an ongoing use

regime.[8]  And, in the absence of a use agreement among the siblings, Patricia's authority to burden the whole of the Ranch was limited.  While she could condition her own gift on compliance with the use directives, she lacked the ability to burden the sibling's preexisting 25 shares from Louis and Melba.

The resulting structure is difficult to reconcile.  Patricia sought to condition her fractional interest, yet each sibling's preexisting possessory rights arose from an unrestricted cotenancy interest she did not control.  Even assuming the Trust Amendment provided a workable means of enforcing the use restrictions against siblings who independently retained lawful rights to occupy the entire Ranch, the conditions set forth by Patricia by penalty of forfeiture are not.

As we explain below, the forfeiture penalty as well as the lack of specificity of the conditions set forth in the Trust Amendment and Handwritten Instructions present independent enforceability problems.

### 5.    The Use Directives Enforceable by Forfeiture Are an Indirect Restraint on Alienation

In part III.C.3, *ante*, we considered the nature of the interest was created by the Trust Amendment and Handwritten Instructions, finding these instruments created a fee

---

[8]    With respect to whether there was an implied use agreement among the siblings, the record is replete with evidence of dispute among them concerning the use directives, rather than mutual acquiescence.  Indeed, a dispute about the designated fields followed shortly after administration of the Trust.  Price used fields the Trust Amendment assigned to Lee, prompting Lee's June 10, 2021 action for damages against Price.  Price filed for partition on May 8, 2020.  Further, Deniece now disputes the validity of the Trust Amendment.

To the extent Lee relies upon Price's receipt of a quitclaim deed referencing the Trust as evidence of an implied agreement, that instrument establishes only the transfer of his fractional beneficial interest and does not, without additional evidence of mutual assent, demonstrate an agreement among cotenants to modify their cotenancy rights, including rights of possession and use.  Further, while Deniece represented that the Trust Amendment and Handwritten Instructions are part of the Trust, she did not concede that the use directives are enforceable, nor did she, by administering the Trust, agree to modify her preexisting possessory rights in the Ranch.

interest subject to a condition subsequent.  Under the Trust Amendment, a sibling who fails to comply with the use directives forfeits the interest Patricia conveyed.  Those directives require compliance for the duration of each sibling's lifetime.

We now address whether the forfeiture-backed directives, though framed as restrictions on use of the Ranch, function in practice as an indirect restraint on alienation.

Civil Code section 711 voids "[c]onditions restraining alienation, when repugnant to the interest created."  (*Godoy v. Linzner* (2024) 106 Cal.App.5th 765, 778 (*Godoy*)) ["Subjecting a fee simple interest to an unreasonable restraint on alienation is both prohibited by law and contrary to public policy"]; *Murray v. Green* (1883) 64 Cal. 363, 367 [" 'a fee simple estate and a restraint upon its alienation cannot in their nature co-exist' "].)

" 'The traditional rule against restraints on alienation is based on the public policy notion that the free alienability of property fosters economic and commercial development.' " (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 23; *ibid.*, citing § 880.020, subd. (a)(1) [" 'Real property is a *basic resource of the people of the state* and should be made freely alienable and marketable to the extent practicable in order to enable and encourage full use and development of the real property' "].)

A restraint on alienation may be direct or indirect.  " 'A direct restraint on alienation is a provision in a deed, will, contract or other instrument which, by its express terms, or by implication of fact, purports to prohibit or penalize the exercise of the power of alienation.' " (*Carma Developers* (*Cal.*)*, Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 369 (*Carma Developers*).)  An " 'indirect restraint on alienation arises when an attempt is made to accomplish some purpose other than the restraint of alienability, but with the incidental result that the instrument, if valid, would restrain practical alienability….  Ordinarily an indirect restraint does not restrict the power of alienation but only the fact of alienability.' " (*Ibid.*)

32.

Use restrictions enforced by forfeiture are indirect restraints because they limit the possible uses of property and render it less marketable. Both direct and indirect restraints are subject to the same reasonableness analysis under Civil Code section 711. (*Carma Developers*, *supra*, 2 Cal.4th at p. 369.)

"[Civil Code] [s]ection 711 only invalidates *unreasonable* restraints on alienation." (*Godoy*, *supra*, 106 Cal.App.5th at p. 779.) " 'Reasonableness is determined by comparing the justification for a particular restraint on alienation with the quantum of restraint actually imposed by it. "[T]he greater the quantum of restraint that results from enforcement of a given clause, the greater must be the justification for that enforcement." ' " (*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1059.)

*Godoy* is illustrative. There, the settlor amended her revocable trust to leave her house to her three children as tenants in common. (*Godoy*, s*upra*, 106 Cal.App.5th at p. 771.) The amendment expressed the settlor's wish that the home stay in the family with "no outsiders," directed that any child wishing to sell could sell only to the other children for $100,000, and included a no contest clause penalizing any child who challenged the arrangement. (*Ibid*.) The settlor's purposes were straightforward: she wanted to preserve the home for her family across generations. (*Id*. at p. 779.)

After the settlor's death, two of the children petitioned for a determination of the amendment's validity. (*Godoy*, *supra,* 106 Cal.App.5th at p. 772.) The court found the restrictions were mandatory rather than precatory, but nonetheless an unreasonable restraint on alienation, and declared the amendment void. (*Ibid*.)

On review, the appellate court weighed the settlor's justification—specifically, the desire to keep the home in the family—against the quantum of restraint imposed. The court found that even assuming the justification was legitimate, it was insufficient to overcome the substantial marketability harms the restrictions created. The fixed sale price stripped the beneficiaries of hundreds of thousands of dollars in market value if they

33.

exercised the only available transfer option, the "family-only" restriction effectively foreclosed transfer to any third party, and the restrictions operated without temporal limit.[9] (*Godoy*, *supra*, 106 Cal.App.5th at p. 779.)

Not all forfeiture-backed restrictions affecting property use constitute an unreasonable restraint on alienation. California law distinguishes between restraints that regulate transferability and conditions that merely regulate the manner in which land may be used. Although a land use restriction may incidentally burden marketability, it may nonetheless remain enforceable where it functions as a genuine use restriction rather than a mechanism which, in practical effect, restricts alienation.

*Mountain Brow Lodge No. 82, Independent Order of Odd Fellows v. Toscano* (1967) 257 Cal.App.2d 22 at page 23 (*Mountain Brow Lodge*) illustrates the distinction. There, the court considered whether certain conditions in a gift deed to an Odd Fellows lodge amounted to an unreasonable restraint on alienation. The deed stated the property was "restricted for the use and benefit" of the lodge only, and if the property stopped being used as a lodge or if the lodge was sold or transferred, the property would revert to the grantors or their heirs. The court severed the deed into two components. The transfer restriction was void as a direct restraint on alienation. (*Id*. at pp. 24, 26.) The use restriction, however, was held enforceable as a fee simple subject to a condition subsequent, on the principle that "conditions restricting land use have been upheld by the California courts on numerous occasions even though they hamper, and often completely impede, alienation." (*Id*. at pp. 25–26.)

Patricia's use directives, enforced by forfeiture, are framed as instructions governing how the Ranch should be used. They do not contain any direct restriction on transfer. In practical operation, however, they function to keep the Ranch within

---

**9**    The *Godoy* court did not address the severability of the use restriction from the transfer restrictions. Rather, the court treated the amendment as an integrated expression of an unreasonable restraint on alienation and voided the amendment in its entirety.

Patricia's family and within the use patterns she approved during her lifetime. The directives obligate compliance for the lifetime of each sibling, and any deviation risks forfeiture of the interest Patricia conveyed. We are persuaded that they resemble the restriction struck down in *Godoy* more so than the restriction upheld in *Mountain Brow Lodge*.

As in *Godoy*, Patricia distributed property to multiple family members as tenants in common while attempting to preserve family control of the property across generations. In *Godoy*, the settlor used a family-only sale mechanism backed by a no contest clause. (*Godoy*, s*upra*, 106 Cal.App.5th at pp. 771, 779.) Here, Patricia used forfeiture-backed use directives. The mechanism differs, but the practical objective is the same—to deter transfer outside the family and preserve the property according to the settlor's wishes.

The settlors' justifications are also identical. In *Godoy*, the settlor sought to ensure the home was kept in the family. (*Godoy*, *supra*, 106 Cal.App.5th at pp. 770–771.) Similarly, Patricia expressed her desire that the Ranch, which had been in "[her] family for over one hundred (100) years" continue to be used (and divided) as it had been during her lifetime. The justifications track *Godoy*'s in substance.

The quantum of restraint is also comparable. In *Godo*y, the amendment permitted intrafamily transfers, albeit at a below market value price. (*Godoy*, *supra*, 106 Cal.App.5th at p. 779.) The Trust Amendment here contains no analogous provision. There is no permitted sale at any price; no consent-to-sell provision; no buy-out mechanism; and no temporal limit on the use restriction, other than the death of the sibling-beneficiary. A sibling contemplating sale has no pathway to effectuate a transfer free of exposure to forfeiture.

The impact on marketability confirms this. A prospective buyer of any sibling's cotenancy interest faces the seller's presale risk of forfeiture, continuing use obligations

35.

during the seller's lifetime, and litigation risk from the nonselling cotenants. No rational buyer would accept these risks without a substantial discount to the market price.

We conclude that under *Godoy*, the Trust Amendment fails as an unreasonable restraint on alienation. Patricia's intent to preserve the Ranch, which had been in her family for generations, is arguably a legitimate justification. (*Godoy*, *supra*, 106 Cal.App.5th at p. 779 [assuming without deciding that the settlor's justification of keeping the home within the family was a legitimate justification].) However, the quantum of restraint is substantial relative to Patricia's justification.

Although *Mountain Brow Lodge* confirms that some forfeiture-backed use restrictions may survive scrutiny, the use directives here are functionally different. There, the grantee held the entire interest in a discrete parcel, and breach of the use condition triggered reversion of the entire interest in that parcel. The breaching party lost both ownership and possession of the parcel. (*Mountain Brow Lodge*, *supra*, 257 Cal.App.2d at pp. 23–24.) The forfeiture mechanism thus accomplished what the use restriction required by ensuring that an owner which ceased operating the property as a lodge would not retain the property.

The forfeiture mechanism here does not operate that way. It reaches only the 8.33 percent interest Patricia conveyed. A sibling who breaches the use directives forfeits Patricia's gift but retains the 25 percent preexisting interest from Louis and Melba with full cotenancy possessory rights to the entire ranch. The penalty cannot prevent any alleged prohibited use. It can only reduce the violator's ownership interest share after the fact, while the violator continues to enjoy a coequal right to occupy and use the land.

The severance framework in *Mountain Brow Lodge* is unworkable here for a second reason. The deed in *Mountain Brow* contained two structurally independent provisions, each with a complete condition subsequent with its own triggering event and its own divestment consequence. First, cessation of lodge use triggered reversion.

Second, sale or transfer triggered another. (*Mountain Brow Lodge*, *supra*, 257 Cal.App.2d at p. 24.) The court could strike the transfer restriction while preserving the use condition because each provision functioned independently.

But the Trust Amendment here has no comparable structure. It contains a single condition subsequent: use of the designated fields subject to forfeiture for noncompliance. This represents one integrated condition, and neither half functions on its own. Without forfeiture, the use directives are simply a description of conduct Patricia would have preferred. (See Rest.2d Trusts, § 11, com. a, p. 32 [a condition subsequent is characterized by the provision that if the transferee should fail to perform a specified act his interest should be forfeited].) Without the use directives, the forfeiture provision has nothing to which it can attach.

Severing the forfeiture mechanism from the use directives therefore does not produce a use restriction that can survive on its own. It produces no enforceable obligation at all. The directives operate as a condition subsequent—the same category as the use restriction upheld in *Mountain Brow Lodge*. However, without the forfeiture penalty, they are not conditions subsequent at all. The forfeiture penalty is the only enforcement consequence available, and without it, the directives are unenforceable.

More importantly, however, we are not persuaded that the use directives are sufficiently clear to inform the parties of their obligations. Our analysis is fully detailed below.

### 6.     The Use Directives are Impermissibly Vague

The use directives under the Trust Amendment and the Handwritten Instructions require the siblings to:

a. "continue to operate the family ranches";

b. "continue using" designated fields "as currently used"; and,

c. the Ranch "continue to be used as it is used and divided at the present time by [the siblings]" prior to Patricia's death.

The probate court observed that the use directives might be capable of enforcement at their extreme. If, for example, a beneficiary subdivided and developed shopping malls on a designated field. However, the existence of a hypothetical extreme violation does not rescue a directive whose core operative terms are indefinite. California law requires that obligations be reasonably certain in their terms to be enforced. (Civ. Code, § 3390, subd. (e).) An obligation that operates clearly only at its margins, while leaving the central scope of the required conduct undefined, cannot be enforced.

We conclude that the imprecision of the conditions crafted by Patricia render them unenforceable. We examine each of the conditions below:

### a.    *"Operate the family ranches"*

The first condition, requiring the beneficiaries to "operate the family ranches," fails to specify whether the obligation requires personal operation by the beneficiary, operation through a hired manager, or operation through a third-party lessee. Consequently, a beneficiary who leases property to a third-party ranch operator might believe she is "operating the family ranch" because the property continues to be used for cattle ranching under her ownership. A nonleasing cotenant might argue that a leasing cotenant has ceased "operating" because the latter no longer personally engages in the ranching activity. The directive does not resolve the dispute.

### b.    *"As currently used"*

The phrase "as currently used" references a state of affairs that is not tied to a specific temporal baseline. The possible baselines include: The use of the fields at the time the Handwritten Instructions was signed in 2014, the Trust Amendment's execution in 2015, the use of the fields at the time of Patricia's death in 2016. This materially affects what constitutes compliance.

For example, assume Lee grazed cattle on one of his fields in 2015, then leased the field to a third party in 2016. Measured against 2015, the lease departs from the use "as

38.

currently used."  Measured against 2016 however, it is exactly the use in place at Patricia's death.  The directive does not clarify which baseline controls.

### c.  *"As [the Ranch] is divided at the present time by [the siblings]"*

This phrase presupposed that there was a specific division of fields and use among the siblings at the time the Trust Amendment was executed.  But the siblings shared an undivided cotenancy in the whole property at the time of the Trust Amendment.  What looked like a "division" was actually an informal pattern of use, not a legal allocation of property rights.  The directive's attempt to make this informal pattern enforceable runs into the structural problem that the cotenancy framework does not permit exclusive use rights, and Patricia did not effect the formal partition that would have created separately owned parcels capable of being subject to use conditions in the way the use directive contemplates.

Based on the foregoing, we conclude that the use directives fail to provide the degree of certainty necessary for judicial enforcement.  While all trust instruments require a degree of interpretation, the operative obligations here are too indefinite to provide an ascertainable standard by which a court could determine compliance, breach, or an appropriate remedy.  Because the use directives fail to articulate definite obligations, we conclude they are unenforceable.

## DISPOSITION

The probate court's order is affirmed.  Deniece and Price are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

39.